LLC. We'll hear first from Mr. Johnston. And I noticed that it stopped. And so thank you for the team. Thank you. Thank you, Shirley. Thank you, team. Thank you. Good morning, and may it please the Court. Can you all hear me okay? Yes, just fine. I'm Robert Johnston, and I represent Canium. Canium is an oil drilling company that operates in the Gulf of Mexico. And I won't rehash the facts other than to simply state we're here today on issues of law that are arising out of a drilling contract whereby Canium hired ENSCO to provide a jackup drilling rig that's a barge that can float into place and elevate out of the water on three legs. And it was a 13-month contract. It was not forecast to be a 13-month contract. And there is a significant difference of opinion as to what the cause was, whose fault it was, and whether, as my client claims, ENSCO was grossly negligent in its performance of the contract. We actually, at the time that the motion for partial summary judgment was granted by the district court, we had discovery out to ENSCO and had in fact filed a motion to compel on issues to get documents related to their management of this job, their funding of the rig's needs, which were not being taken care of, things of that nature. But the Court ruled that it was a pure issue of law and granted the motion for partial summary judgment. The issues that I'm going to focus on, although we feel strongly about what we've briefed, are really twofold. The first is the Court erred when it held that the drilling contract was subject to only one reasonable interpretation. And we're really talking almost exclusively about Section 15 of the drilling contract. That sets forth the indemnities. It also sets forth the waiver of consequential damages clause, which is the heart of the matter as far as we're concerned. We believe that, you know, to the extent that there was only reasonable — It's 15. Pardon me? I mean, 16. It's 15.16 might be? Yeah. Yeah. Yes, it's 15. I'm sorry, go ahead. No problem at all. And so if there is only one reasonable interpretation, from our view, it has to be, and frankly, it could be actually an issue of fact, but from our view, it can't be clearer that this contract was drafted with the intention of the parties that neither would profit from acts of gross negligence or willful misconduct. So that's set forth specifically in the indemnity section. Gross negligence and willful misconduct are not mentioned in the waiver of damages section, the waiver of consequential damages section. So the Court further erred when it read in to the waiver section that gross negligence and willful misconduct caused damages were also waived. And then finally, the Court erred when it did not follow Todd Shipyard's and Houston Exploration, which are cases from this Court, holding that any clause, a waiver clause, as opposed to an indemnity clause, that that is anything that purports to exonerate a party for liability for its own gross negligence or willful misconduct is void as a matter of law. So we have alleged gross negligence. That's what we're asking the Court to give us the opportunity to do discovery and present it to the District Court in order to let the Court decide whether we have met our burden of proof. But the language says when there is damage to our loss of the well. And there was a loss of the well. And they redrilled. But it said the redrilling is cantum sole and exclusive liability. What does that say? So there's two pieces to that, Your Honor. So the first part is, I mean, that, according to ENSCO, and the contract says what it says, that redrill obligation on ENSCO's part at a 15 percent discount arises only if they're grossly negligent or there's willful misconduct. The redrilling is the exclusive remedy. In other words, no remedy. If something's gone wrong with the well, the only remedy you got is we will redrill it. And that's what it says on its face. That's a terrible passage. Well, the gross negligence is the rub there. Because the gross negligence that is being read into the waiver of consequential damages. So there's two pieces to that. One is the redrill. And that is what Canty and Pade. But it says monetary damages. The gross doesn't alter the meaning of monetary damages. Right. That's what I'm taking too long to answer your question, I think. So there's different components of the monetary damages, all right? The first is what Canty and Pade and ENSCO as a day rate of $80,000 a day to redrill that well. The second, though, is all of Canium's associated costs, which are consequential damages. Those are defined as various things, spread costs, the cost of having boats on higher during the redrill, things of that nature. Plus, the redrill is not the only thing that Cantium is suing over. They're suing for grossly negligent performance outside of the redrill period and outside of the Kingswell incident. So to the extent that the court is focused on the redrill, that does not dispose or decide the entirety of the counterclaim. But your burdens have shown some content to sole and exclusive remedy other than what it says on its face. Well, and our take on that and, frankly, our argument and what I'm trying to persuade the court of today is that the gross negligence component of that clause, the redrill clause, which is that clause you just cited brings in section 9F of the contract, which says that you only get the redrill rate. They're only limited to the redrill rate as compensation if they were grossly negligent or willfully committed misconduct. So that contaminates both of those clauses, 15.6 and 9F. And, again, there are numerous other claims outside the scope of the Kingshill incident, as we call it, which is the initial loss of the well, as well as the subsequent redrill and the associated costs from that, which... At 1521, the parties mutually waived these things. They absolutely did not want to be mutually waived. Whether that was a good idea, perhaps was not a good idea. But it says they're mutually waived. So it's specifically. And the other section does not put this exemption back into play. I don't understand how your interpretation works with the text. It's like Judge Ashton. Okay. Let me try to help. So, first of all, I think it's important to look at the context of the precedent of this court. You have Todd Shipyard, which is a Fifth Circuit case that says any provision in a contract purporting to limit the liability of a party to... for instance... Oh. Oh, not at all. That's... I know. No. You're saying Todd Shipyard. Yeah. Todd Shipyard somehow says that you can't deliver. Correct. Yeah. It's void. Well, that's what they did in Todd Shipyard. Todd Shipyard is a red-letter release, as it's known, whereby a shipyard performs work on a vessel and there is a part of the contract that says we disclaim everything. We disclaim merchantability, workmanship, and we disclaim gross negligence. Which is void as a matter of public policy. I'm not disputing with the court that my client's signature appears on the contract. I'm not disputing that the contract says what the court is reading. Todd Shipyard says that you can't deliver. Todd Shipyard's Houston Exploration says that, cited in our brief. The Agip case alludes to that, and the Becker case, which relates to indemnity, and that's another way that this has gotten a little blurry. This is not void against public policy, is it? Yes. Although, I'm going to try to persuade you of one other part of that. Okay. I definitely lose as to redrill, Your Honor. As to the other parts of the contract, 15.16 is a stand-alone section that follows the indemnity sections, which are typical knock-for-knock indemnities. And those, both of those, and that section, 15.16, says that to the extent any claim or loss is caused by gross negligence or willfulness conduct, that the indemnity is voided, and the obligation to defend, indemnify, and hold harmless. And those indemnities, first of all, 15.16 begins with the words, notwithstanding anything to the contrary in this agreement. Notwithstanding anything to the contrary in this agreement. Not in this paragraph, not in the paragraph after it. In the entire agreement. And that was completely overlooked and not discussed by the district court. Those words mean something. They have to be given some effect in order to make sense out of the entirety of Section 15. Second of all, it is legal error, pure legal error, in order to import or insert gross negligence and willfulness conduct into 15.21, the consequential damages clause. In other words, let's start with the Becker case. That's an indemnity case. And in Becker, let me pause for a second. We filed a Rule 28-F letter this morning, not because we have found what we think is a controlling case from the circuit. It's actually a district court case. But it gives an overview of the issues where indemnity may flow out one way and waivers may flow out a different way. It's in re deep water horizon. And what the district court in that case pointed out was, in Becker, a case that I was in, the whole issue was whether tidewater was entitled to defense and indemnity if it was grossly negligent. Does it matter that Becker is about indemnity, as you pointed out, and not limitations on damages? Yes. Yeah. Well, it matters from my standpoint, of course. But what Becker says and what actually re deep water horizon says is that the gross negligence if proven would have voided the indemnity for one of two reasons. One is public policy. And they cited Todd Shipyards in the Becker case. The other, though, is that the indemnity obligation in Becker in favor of tidewater did not indemnify expressly for gross negligence. And absent that express indemnity for gross negligence, tidewater was not entitled to it, perhaps. And then you get into the waiver of liability cases. And this is discussed extensively by Judge Barbee and in re deep water horizon. And again, not controlling, but it is a very illuminating discussion. The law of this court, the law of this circuit has been that no matter what the contract says, a clause purporting to limit the liability of a party for its own gross negligence is void as a matter of public policy. Period. But that's not this provision. I read it. What it is, it is a limitation of their liability. And it just says notwithstanding. That's what it says. It's limiting because we're narrowing our responsibility and there will only be a liability. You have a remedy. We're not taking away all your remedies. Our remedy is we'll rejail the well. We'll go down again. We'll put it down again. But that's it. But that doesn't dispose of the case, too. That's not the only event we're suing over. We're suing over their grossly negligent and willfully poor performance under the contract because they refused to put the money into this rig to repair it. And it had been laying idle for years. With what consequence? The consequence was that it took, instead of the 250 days... The consequence of which the well failed? No. No. That is a claim. And I'm hearing very clearly where the court is coming from on the redrill claim. But the overall drilling campaign was supposed to take 250 days. It took 397. 397 days. And as a consequence of their grossly negligent performance, which caused slow work, downtime, their mismanagement of scheduled downtimes, they told us that one mandatory inspection period would last five days. It lasted 26. And we were reassured on an ongoing basis it was just about to be done. Just about to be done. And meanwhile is incurring spread costs, which yes, those are discussed in the waiver of consequential damages. But at the same time, they should not be relieved of that if they were grossly negligent or willfully misleading us as to what was going to happen. What do we do with the 1967 case of Alcoa that said that public policy arguments are not an issue so long as there's no unequal bargaining power and the limitations did not remove all deterrents for contracting parties' gross negligence or willful misconduct? Because as Judge Higginbotham's questions showed, not everything is eliminated. So first of all, this Court has been ruling since subsequent to that case that red letter clauses relieving someone from gross negligence are void. As for that case, I think the court the district court needed to allow us to put on evidence because yeah, these were two sophisticated parties but the evidence will show and has shown since the granting of the summary judgment because we're still litigating with a July trial date that this was the only rig in the Gulf of Mexico that could drill a well and that ENSCO was unwilling to make meaningful changes to the drilling contract. Now, does that rise to, you know, unequal bargaining power or does it also meet the part of the test which is that it must not eliminate all incentives? I mean, they had incentives here. They followed their incentives. They were being paid $80,000 a day whether this took 250 days or 397 days. Thank you. Thank you. Time for rebuttal. Thank you. Mr. Isaac. May it please the court. Your Honors, I had a very different argument planned but given some of counsel's arguments and concessions in his oral argument, I want to focus on a few things. The first is the plain language of Section 1521. If the, if the plaintiff plain language of Section 1521 is applied, we win on everything and as Judge Ashe correctly held. Section 1521 could not be plainer. That clause says that operator and contractor mutually waive and release on behalf of themselves and their respective group all of the following claims for damages arising out of this contract and then it goes on to list consequential damages and specifically spread costs. Those are the only type of damages that Cantium is claiming. So under that clause, reading it plainly, we win. We can stop there. Well then they say Todd Shipyards says no we can't. So let me address the public policy argument. You have addressed that in your brief in pages 29 and 30 of your brief. Yes. You say that Todd's doesn't say that. Todd does not hold that a red letter clause does not apply based on public policy in gross, in a gross negligence situation. Todd's does not make that ruling because Todd's says that there was no gross negligence. So it did not need to reach that question. To the extent that Todd says that, it is dicta. Houston Exploration, which they also cite, is a case under, first of all it's an indemnity case, not a limitation of liability case. I have that wrong. It is a limitation of liability case. But it's under Louisiana law and Louisiana law, unlike general maritime law, has a specific statute that holds that exculpatory clauses that exculpate for gross negligence are barred by statute. There is no such statute in federal law and there is in this circuit no such holding under federal common law. And I am a little surprised that we are discussing public policy, and this was a point we made in our brief as well. Let me take you away from public policy back to the language. The word when, it seems to me that that's a word you've got to travel through. When what? When that event occurs, the argument that I would hear you or those two make would, well, when that when means it addresses a particular event, and hence it will properly read as that when we drill that our re-drilling operation, and whatever comes out of that operation, we have no liability for it. In other words, we drill and it falls again, that's it. But I would really like to, I'm not sure what meaning we give to when. The natural reading of that is that any damage is spirit. It's you've allocated all your damages. You know, you've reached a point now, the will has failed, and now you're going to go forward. And at that point it says, you say, okay, we're going to re-drill, but the damages are, we're out of here. Right, so that's exactly right. So on the portion. Yeah, I thought you'd say that, but why? Well, because that's what the contract says. It clearly contemplates that if there is a failure of well control, and this is 15.6, the operator releases the contractor group from claims by the operator for that damage or loss. The one exception it gives is re-drilling the well under 9.1F. And what 9.1F says is that the remedy when there is a loss of well control that is a result of gross negligence or willful misconduct is only, the sole and exclusive remedy is re-drilling the well at this lower rate, which is about a 15% haircut off of the normal day rate for the rig. So for those damages, the contract very clearly spells out what happens when there is a loss of well control that leads to the loss of the formation or the well, and the only remedy, the sole and exclusive remedy, even in a case of gross negligence or willful misconduct is re-drilling. What damages, you're saying your damages are that led to the failure, are you saying your damages led to the failure that occurred? The vast majority of their damages. Their conduct, their misconduct, for which you say they're liable, caused the failure? That is... Are disconnected from the failure. So most of their damages are arising out of the failure of the well. That's what they claim. There is a smaller portion of their damages that they say result from our client's alleged gross negligence that led to a delay of the well, drilling the well, aside from the loss of well control. It's a much smaller portion of their damages. But even there, you have the plain language of 15.21, which goes back and says you can't recover consequential damages and specifically spread costs, which is all they're asking. So all of those sections together, 15.6, 9.1F, and 15.21, make clear that none of the damages that Cantium is seeking are recoverable under this contract. Mr. Isaac, are you arguing to us that if your client intentionally sabotaged the project, that the only remedy they would have is to pay 15 percent less for it to be done again? Is that the situation here? Is that the contract that was agreed to? The contract that was agreed to for contractual damages says that. And I think that's an important distinction here. We're not talking about a case where, like Todd Shipyard, for example, where there was damage to equipment, or worse yet, damage to the environment, or damage to our personal injury damages. We are talking about a contract— Those are third party. Third party, or even damages to Cantium's equipment. We're talking about completely economic damages. And kind of going back to the public policy point, when you're talking about completely economic damages as opposed to property damages or personal injury damages, the policy that supports freedom of contract is strongest there. So is the answer to my question yes? The contract would say that if my client intentionally caused this to happen, the only remedy they have is to do it over again with 15 percent discount. Is that correct? I think in terms of the contractual damages, obviously there are other incentives not to  do that. So is the answer yes? The answer is yes for that particular question, which is not before us today, Your Honor. Well, it is—I mean, we have to decide whether gross negligence and intentional conduct precludes consequential damages under any circumstances. And that's what you're saying. That's the  Well, first of all, I don't think that's the issue before this Court. Because I don't think that they have—that they raised it appropriately below or here. They did not argue below that— But you're perfectly happy for us to say that's the deal they made. I thought you were willing to go along with that when you pivoted today. Well, it is a—you know, look, I think in this context where you're talking about economic damages, I am absolutely perfectly comfortable to say you're talking about two sophisticated parties. The parties can make their own deal. And that's what the second OJIP case, another district court case, said, is that the parties—you're talking about freedom of contract. You're not talking about injury to persons, property, or the environment. I think in those cases it's perfectly capable for parties to make their own deal. How do we square Alcoa and Todd's Shipyard? Well, first of all, as I said before, Todd's Shipyard does not hold. You said it's dicta. Is that how you square them? It is dicta. I also—there's the prior precedent rule. But Alcoa makes—is, as you pointed out, I think in—when talking to Mr. Johnston, it is squarely on our side. Because you have—you have no unequal bargaining, and there's no evidence in the record that there was unequal bargaining power. And these are two sophisticated oil and gas companies. I think we all agree with that. And the contract has plenty of incentives not to act negligently. For example, 15.16 is an incentive. There are—if negligence causes—they talk about delay in the rig, or in the drilling operations. If negligence causes that, and it's a delay of more than six hours, the rig goes on zero rate, and we don't get paid. So that's a pretty strong incentive not to be negligent. So under Alcoa, absolutely supports us. It is the prior decision to Todd's Shipyards. Todd's Shipyards is dicta, and the facts of Todd's Shipyards are very different. Because in Todd's Shipyards, you had an absolute limitation on damages of $300,000. Here you are not limiting damages absolutely at all. You're only limiting a certain category of damages, consequential damages. I find it natural to read this thing that, okay, the wheel goes down, and whatever disputes you may have among yourselves, they—this provides it. Well, are we going to read—are we going to drill again? And the answer is, well, we'll drill again, but the—but that's the only remedy for anything. In other words, that would—the wind would reach back to whatever disputes you may have now. In other words, this speaks to the circumstance where the wheel has failed now. We will redeal, but we are not going to do this again. If we got any other liabilities, you're going to throw at us. I'm sorry, Your Honor, I'm not quite understanding your question. I guess what you're saying, what happens if they—if they decide not to redrill? I understand you don't understand it, but I'm just—I'm asking you to look at the time. You focus in on zero and on the moment in time, and that—and when you look at the natural reading of this is—addresses the circumstances of the parties when the wheel failed. And at that point, they say, well, we would just address the situation of, well, okay, we'll go forward and drill the second wheel, but there's no other liabilities here. In other words, we're not going to go drill another wheel and then turn around and be sued. I think the—I think that's what the contract contemplates. I think there's a reason for that, and I think this goes also to Chief Judge Arad's question. The reason for that is because drilling an exploratory well in the Gulf is a very fraught enterprise, and the parties allocate risks in that way because this is something that occurs, and it's—you're drilling into an exploratory well, you're drilling into untested sands, you don't know what is going to happen. And if—it is, I think—one thing, if we say that public policy bars these types of clauses, you're going to have a lot more—for gross negligence, you're going to have a lot more lawsuits when you do have these kind of well control events. And so the parties, knowing that, knowing about the difficulty, going in, make this decision to allocate risk, that is something that two sophisticated parties commercially can decide to do. Do we have another choice today besides answering Professor Angeron's previously unanswered question, or because of the way this is now postured, we're going to have to answer that question? Well, Your Honor, that's what I was trying to get to. You don't need to answer that question because they have not raised the public policy issue sufficiently, either below or here. There are citations to cases involving public policy, but this Court's case law says that to raise an issue and preserve it for appeal, the party must press the issue rather than merely intimate it. Here they don't actually say that the clause in their briefs, or below, that the clause, that Section 1521 or Section 15.6, are void for public policy. They cite these cases and suggest that there's an ambiguity in the contract because of these cases, but they don't actually come out and say that these clauses should be invalidated, and they didn't do that below, either, which may be part of the reason why Judge Ash didn't even discuss that, because it wasn't fully briefed and argued in front of that Court or this Court. And I would submit, Your Honor, that if this Court is going to make the radical decision to interfere with a party's freedom of contract, that is perhaps in contrast to the Alcoa decision, which privileges freedom of contract in the maritime context, that it should do so on a much better developed record when the party has actually made the public policy argument, which they didn't below and they don't do here. So, yes, I do think there is a way for the Court to avoid answering that question, simply to construe the contract in the context of economic damages, which is what we are looking at here, and affirm the grant of summary judgment. Thank you. Thank you, Your Honors. If the Court has no other questions, I'll— I have one more. Yes, Your Honor. What role does the argument that to hold harmless means to identify and secure the rights of the people of the Caribbean? Well, I think that Section 15.6 really states that Centium needs not identify and answer for certain damages, but still release in scope. That is a—thank you, Your Honor, for asking that question. I think that Camium has conceded this, but if they haven't, in the context—we cited about 20 cases in our brief, maybe not 20, but we cited a number of cases—I think we had more than 20 and we cut some of them down—that say that when the phrase protect, defend, and hold harmless is used, that triplicate is always meant to mean indemnify. And we also cited an article by Brian Garner that I think goes all the way back to the Anglo-Saxons and talks about how— All of your articles go back to the Anglo-Saxons. I know. I think that's the way our jurisprudence works these days. That's what happened to him. So, but yeah, that phrase is exclusively used in the indemnity context. Also, if you look at the way it's actually used in the contract, if you look at the contract as a whole, it's always used in the indemnity context. And I think it's also telling that 15.21 uses different words. 15.21 talks about release and waive. That is different than protect, defend, and hold harmless. So both the customary usage of those terms in contracts and the way it is used in this particular contract mean that that limitation, 15.16's limitation, is exclusive to the indemnity provisions of the agreement. Thank you. Thank you, Your Honor. I appreciate the argument. Mr. Johnston. So I'll begin with—I'm going to try to respond to several points, and I'll hit them quickly. There's been no waiver of the public policy argument. We've cited backer-tied shipyards, Houston exploration. We've supplemented with NRA Deepwater Horizon. Our briefing is shot through with the whole point that gross negligence is a special thing, and that these agreements really run afoul of the notion that if a party is committing acts which are grossly negligent or intentional, that they should not be relieved of any of the consequences of those things. I'm going to step for a moment, outside of my role here today as Canium's lawyer, to your question of—well, not does the court have any choice. The court gets to decide if it has any choice. But should the court answer Mr. Angeron's question? As somebody who's been practicing in this area for 32 years, we really need your help on this point. It is something I deal with on a weekly, if not daily, basis in my practice of drafting contracts and litigating them and advising clients. Gross negligence, willful misconduct, we could really use the clarity if the court is inclined to give it. The question about does hold harmless equal indemnify? Not one of those cases—there's one district court case from the Eastern District. Not one of those cases is a Fifth Circuit case. And frankly, I don't believe any of them are Circuit Court cases at all. So I guess I'd like to point something out here. We're talking about treating hold harmless as just a surplus word that means nothing at all. They could have left it out and you would have the same result under an indemnity analysis. But we're also—you are being asked to read into Section 15.21 an exemption for grossly negligent and willfully caused damages. So if you're going to erase hold harmless or say it means exactly the same thing as that, how do you then justify the leap to say gross negligence—this is, again, it's the special thing—gross negligence and willful misconduct are not mentioned in 15.21. It was absolutely error for the district court to read those into it and say, hey, freedom of contract in the first place, okay? They're not in there for a reason. And in fact, 15.16 makes very clear these parties did not want anyone to benefit, have any relief from the consequences of gross negligence. Briefly on Todd Shipyard's, the court ruled that Todd was not grossly negligent and overturned the district court decision which found that they were grossly negligent and that the waiver for gross negligence was void. That was the district court's decision. Why did the Fifth Circuit go through the exercise of analyzing the entire record to determine whether the evidence proved gross negligence if all it had to do—if it could have just said, it's okay. It's an enforceable waiver. We don't even need to do that exercise. So at the end of the day, I mean, if ever there was a case, I think this case needs to be reversed and it needs to go down to the district court for further development. That's obvious. But in terms of what's before the court right now, we have a case that the district court has said is an issue of law. Really, no discovery of any kind was done of consequence. There's no issues of fact right now because of when it was granted in the life of the case. This is a case procedurally that the court really could and we would submit, really, we hope it will weigh in on these important issues. Thank you very much. Thank you. Thank you. We have your argument. We appreciate the helpful arguments from Mr. The court will stand in recess until tomorrow morning. And thank you, students, for coming out.